**CHANDRA L. PETERSON**
California State Bar No. 306935
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chandra_Peterson@fd.org

Attorneys for Mr. Bernal-Sanchez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JHOANTAN VILMAR BERNAL-SANCHEZ,<br><br>Defendant. | CASE NO.:  20MJ20169-JLB<br><br>MR. BERNAL'S MOTIONS TO:<br>1) DISMISS THE COMPLAINT;<br>2) PROHIBIT HIS UNLAWFUL AND UNCONSTITUTIONAL CIVIL ARREST AT COURT; AND<br>3) STAY PROCEEDINGS IF THIS MOTION IS DENIED TO PERMIT MR. BERNAL TO SEEK INERLOCUTORY REVIEW OF THE DENIAL |

## I.    INTRODUCTION

Because the facts and historical evidence presented here show that the original illegal entry law was enacted with a discriminatory purpose and still has a disparate impact, § 1325 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The burden thus shifts to the government to show that Congress would have passed the 1929 law in the absence of any discriminatory purpose. If the government cannot make this showing, the law is invalid, and the Court must dismiss Mr. Bernal's criminal charge.

1    At a minimum, if the Court believes Mr. Bernal has not shown a
2   discriminatory purpose and a disparate impact, it should schedule an evidentiary
3   hearing. At this hearing, Mr. Bernal will present expert testimony as further
4   evidence of the law's discriminatory origins. The Court should also schedule an
5   evidentiary hearing if the government submits evidence the Court believes may be
6   sufficient to rebut Mr. Bernal's evidence. But if the government does not attempt
7   to rebut his evidence, or cannot do so, the law is unconstitutional, and the Court
8   must dismiss the complaint.

9    Finally, this Court should prohibit the arrest of Mr. Bernal at the courthouse
10   as civil deportation arrests at courthouses violates long-standing common law
11   principles, as well as Mr. Bernal's Sixth Amendment and Due Process rights. If this
12   Court fails to grant Mr. Bernal's motion, he will be vulnerable to irreparable harm.
13   Mr. Bernal further requests that this Court stay the pending trial or final resolution
14   of the case until this motion is resolved. If the Court is not inclined to grant the
15   request for a stay, he requests that the Court notify counsel as soon as possible
16   because counsel intends to appeal the denial of the stay to the district court.

## II.      MOTION TO DISMISS THE COMPLAINT

### A.      Relevant History surrounding the Enactment of § 1325

19    In April 2020, the Supreme Court relied on historical evidence of a state
20   legislature's racial motives to strike down a criminal law enacted a century earlier.
21   *See Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). Although the law was later
22   reenacted with no evidence of animus, the Court refused to ignore the "racially
23   discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place."
24   *Id*. at 1401 (emphasis in original). Even the justices' "shared respect for rational
25   and civil discourse" could not "supply an excuse for leaving an uncomfortable past
26   unexamined." *Id*. at 1401 n.44.

27    Like the law in *Ramos*, the law criminalizing illegal entry into the United
28   States at 8 U.S.C. § 1325 has an "uncomfortable past" that must be examined. *Id*.

Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race"[1] would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons."[2] They claimed Mexicans were "poisoning the American citizen."[3] They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[4] Not only did this racism underlie the original statute, the law has disparately impacted Mexicans and Latin Americans in the century since.

### B.    Legal Framework

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See, e.g., Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See, e.g., Arlington Heights*, 429 U.S. at 265–68.

Here, Mr. Bernal challenges § 1325 only under the third rationale, so the legal framework of *Arlington Heights* applies. *Arlington Heights* clarified that the

---

[1] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html.

[2] *See infra* at 8, 10, 11, 16.

[3] *See infra* at 14, 21.

[4] *See infra* at 12-13.

effect of a racially discriminatory law does not alone make it unconstitutional—challengers must also show "[p]roof of racially discriminatory intent or purpose" **at the time of the law's passage**. *Id*. at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including:

1)     the impact of the official action and whether it bears more heavily on one race than another;

2)     the historical background of the decision;

3)     the specific sequence of events leading to the challenged action;

4)     the [legislature's] departures from normal procedures or substantive conclusions; and

5)     the relevant legislative or administrative history.

*Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68).

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a **motivating factor** in the decision." *Id*. at 265–66 (emphasis added). *See also Arce*, 793 F.3d at 977 (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'").

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. *See also Hunter v. Underwood*, 471 U.S. 222, 228

(1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225.[5]

**C.   Congress enacted the illegal entry law with a discriminatory purpose.**

A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 265. They were the primary factor. And as recent Supreme Court precedent confirms, courts must consider this historical evidence in determining the statute's constitutionality.

1.   Under the *Arlington Heights* factors, racism and eugenics were a "motivating factor" in the passage of illegal entry laws.

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268. Applying these factors shows that discrimination was unquestionably a "motivating factor" in the passage of the Undesirable Aliens Act of 1929.

a.   *"The historical background of the decision."*

The 1920s brought a decade of immigration legislation fueled by the eugenics movement and fears of "non-white" immigration.[6] Prominent

---

[5] Courts apply strict scrutiny to laws that are "motivated by a racial purpose or object" under *Arlington Heights*. *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quotations omitted).

[6] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America*, 2019.

MR. BERNAL'S MOTIONS TO DISMISS THE COMPLAINT, PROHIBIT HIS UNLAWFUL ARREST AND STAY PROCEEDINGS

restrictionists "spoke increasingly of 'racial indigestion,'"[7] and "the 'contamination' of Anglo-American society."[8] Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[9]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[10] At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[11] Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.[12] During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." Exhibit A, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representative*, 70th Congress, Feb. 21, 1928, 2–3.

      b.    "The specific sequence of events leading to the challenged action."

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory

---

[7] Ngai, at 23.

[8] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 2010, at 28.

[9] Hernández, at 28.

[10] Yang, at 35.

[11] Ngai, at 24.

[12] *Harry Laughlin and Eugenics*, Truman State University. Accessible at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

intent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census. The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon, as the law on its face did not count "nonwhite people residing in the United States" toward the quotas it established.[13]

Yet there was a wrinkle in the National Origins Act—it did not set quotas on countries in the Western Hemisphere. This was due to the influence of large agricultural businesses that "relied heavily on labor from just over the border."[14] As one representative complained, too many growers were "interested in the importation of these poor peons." Exhibit B, Cong. Rec. House 3619, Feb. 16, 1929. So less than two years after passing the bill, four men began to press a new type of law that would approach immigration from a criminal—rather than a civil—angle.

> c.    *"The relevant legislative or administrative history."*

After passage of the National Origins Act of 1924, the Department of Labor (which at that time governed the Bureau of Immigration) began implementing Congress's new quota system.[15] Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories—even using them as the basis for policies he had developed and published.[16]

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[17] So with help from devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease,[18] Davis developed a compromise—Congress would

---

[13] Ngai, at 24.

[14] Hutchinson, *Legislative History of American Immigration Law, 1798-1965* (Philadelphia: University of Pennsylvania Press, 1981) 212.

[15] Hans P. Vought, *The Bully Pulpit* (Macon: Mercer University Press, 2004) 174.

[16] Vought at 174.

[17] Vought at 216.

[18] For biographical and historical context about Senator Blease, s*ee* Simon, B.

MR. BERNAL'S MOTIONS TO DISMISS THE COMPLAINT, PROHIBIT HIS UNLAWFUL ARREST AND STAY PROCEEDINGS

criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[19] That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[20]

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." Exhibit D, Cong. Rec. 2817, Feb. 9, 1928. Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington, for whom the 1924 "Johnson-Reed" National Origins Act was named. Chairman Johnson headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.[21] He also proudly described his 1924 law as a "bulwark against a stream of alien blood."[22]

Within two years of the 1924 Act, Chairman Johnson convened hearings on new immigration legislation. *See* Exhibit F, Hearings Before the Committee on Immigration and Naturalization, 69th Congress, Hearing 69.1.3., Jan. 12, 1926. The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principle witness was the well-known eugenicist Dr. Laughlin. Exh. A, at 1. Early in the hearing, Chairman Johnson

---

"The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South," The Journal of Southern History, Feb., 1996, Vol. 62, No. 1 (Feb., 1996), pp. 57-86. Accessible at: http://www.jstor.com/stable/2211206.

[19] MacDougall, Ian, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica, June 19, 2020.

[20] *Id.*

[21] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island* (New York City, Facts on File, 2002), p. 242–43.

[22] Roger Daniels, *Guarding the Golden Door* (NY: Hill and Wang, 2004), p. 55.

MR. BERNAL'S MOTIONS TO DISMISS THE COMPLAINT, PROHIBIT HIS UNLAWFUL ARREST AND STAY PROCEEDINGS

praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." Exh. A at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." Exh. A at 3. When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Exh. A at 11.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Exh. A at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Exh. A at 44–45. "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison." Exh. A at 45.

When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." Exh. A at 45. Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation…'" Exh. A at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Exh. A at 46.

Though Chairman Johnson's initial legislation stalled, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate

Committee on Immigration, submitted a report to the full Senate recommending passage of a law "making it a felony with penalty for certain aliens to enter the United States under certain conditions in violation of law." Exhibit G, Report from the Committee on Immigration, 70th Congress, Report No. 1456, at 1. This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Exh. G at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Exhibit H, Cong. Rec. 2092, Jan. 23, 1929. The full Senate passed the bill with almost no discussion or debate. Exh. H, Cong. Rec. 2092.

Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal entry law. Exhibit I, Deportation of Aliens, 70th Congress, Report. No. 2397, Feb. 6, 1929. The language of the illegal entry law was virtually identical to the current version of § 1325. *See* Exh. I at 3. The bill passed, and the president signed it into law days later. Exh. B, Cong. Rec. 3621.

> ### d. *"The legislature's departures from normal procedures or substantive conclusions."*

Examining this *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider any illogical conclusions leading up to the enactment of a law that could signal a discriminatory intent. *See, e.g.*, *Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's decision to "disregard the zoning advice of its own experts"). Here, Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's belief that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately

repealed the eugenics-based National Origins Act of 1924," illegal entry remains one of the only laws still in effect from that era. *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula).

*e.*    *"The impact of the official action and whether it bears more heavily on one race than another."*

Within a year of the 1929 criminalization of illegal entry, the government had prosecuted 7,001 cases; by 1939, that number rose to over 44,000.[23] In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[24] And the number of prosecutions has soared in recent years—since 2008, annual prosecutions for § 1325 have typically hovered around 50,000 or 60,000.[25] So even under a conservative estimate, this means that since the law's passage over a million Mexicans have likely been prosecuted for illegal entry—far more than any other nationality.

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were a "motivating factor" in the passage of the Undesirable Aliens Act. And as new Supreme Court precedent confirms, courts must consider this historical evidence in determining whether a statute is constitutional.

2.    <u>New Supreme Court precedent confirms that discriminatory purpose is relevant to a law's constitutionality.</u>

Two recent Supreme Court cases confirm that a discriminatory purpose that

---

[23] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138–39 (UNC Press, 2017).

[24] Hernández, *supra* n. 6, at 138-39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931-36.

[25] "§ 1325 Defendants Charged (Annual)," Executive Office for United States Attorneys, *available at:* https://www.justice.gov/opa/press-release/file/1210896/download.

11    20MJ20169-JLB

fueled a law's original enactment remains relevant in determining its constitutionality. In *Ramos v. Louisiana*, the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory reasons that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401 (emphasis in *Ramos*). Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that this cured the laws' original animus, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." *Id*. at 1401 n.44. Nor could the justices' "shared respect for rational and civil discourse . . . supply an excuse for leaving an uncomfortable past unexamined." *Id*. (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting families from using state-sponsored scholarships at religious schools. *See Espinoza v. Montana Dep't of Revenue*, __ S. Ct. __, 2020 WL 3518364 (June 30, 2020). The majority relied on the law's "checkered tradition" of underlying religious discrimination, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." *Id*. at *9.

Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that courts cannot examine impermissible motives underlying the original version of a law where states have "readopted their rules under different circumstances in later years." *Id*. at *16 (quotations omitted). Justice Alito stated, "But I lost, and *Ramos* is now precedent." *Id*. Justice Alito then provided an extensive history of the anti-Catholic and anti-immigrant motives underlying Montana's law, concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's 'uncomfortable past' must still be 'examined.'" *Id*. at *19 (quoting *Ramos*, 140 S. Ct., at 1396, n.44).

Here, the original illegal entry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the Immigration and

Nationality Act of 1952.[26] But *Ramos* and *Espinoza* both confirm that not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint.

The government may also argue that even if racism and eugenics were a "motivating factor" in § 1325's original passage, the law currently serves other legitimate purposes. But laws enacted with a discriminatory purpose cannot be "cured" merely because they later satisfy a non-discriminatory purpose. *See Hunter*, 471 U.S. at 233 (rejecting Alabama's argument that "events occurring in the succeeding 80 years had legitimated" a racially motivated disenfranchisement provision). Rather, when a court determines that a law's "original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Id.*

### D. Section 1325 continues to disparately impact Mexican and other Latinx defendants.

*Arlington Heights* requires challengers to show that a law was enacted with a discriminatory purpose and disparately impacts a particular group. *See* 429 U.S. at 265. Here, not only were racism and eugenics a discriminatory purpose motivating the enactment of the first border crossing laws, such laws continue to disparately impact Mexican and other Latinx defendants.

Though no publicly available statistics exist concerning the national origin of persons prosecuted for § 1325 today, the overwhelming number of Border Patrol arrests along the southern border are of Mexicans or people of Latinx origin. In 2000, over 97% of persons apprehended at the border were Mexican. In 2005,

---

[26] *See* June 27, 1952, c. 477, Title II, ch. 8, § 275, 66 Stat. 229; Pub.L. 99-639, § 2(d), Nov. 10, 1986, 100 Stat. 3542; Pub.L. 101-649, Title I, § 121(b)(3), Title V, § 543(b)(2), Nov. 29, 1990, 104 Stat. 4994, 5059; Pub.L. 102-232, Title III, § 306(c)(3), Dec. 12, 1991, 105 Stat. 1752; Pub.L. 104-208, Div. C, Title I, § 105(a), Sept. 30, 1996, 110 Stat. 3009-556.

Mexicans made up 86% of apprehensions, and in 2010, 87%.[27] In the last decade, Mexicans have made up a smaller percentage of arrestees due to increased migration from Central America, but combined, the two groups easily constitute the overwhelming majority of border crossers.[28]

Overall, these disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges. *See, e.g.*, *Ave. 6E Investments*, 818 F.3d at 497 (concentrating most low-income housing in neighborhoods that are 75% Hispanic); *Arce*, 793 F.3d at 978 (targeting a program, 90% of whose enrollees were of Mexican or other Hispanic origin). Combined with the historical evidence of the 1929 law's discriminatory purpose, this disparate impact on Mexican and Latinx immigrants satisfies the first step of *Arlington Heights*.

### E.    The burden of proof shifts to the government.

Because Mr. Bernal has shown both a discriminatory purpose and a disparate impact underlying § 1325, the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266–68, 270 n.21. The Court should thus provide the government an opportunity to make this showing; if it declines to do so, the Court should dismiss the charge.

If, however, the government submits evidence showing that the 1929 law would have been enacted without a discriminatory purpose (or if the Court believes that Mr. Bernal has not shown a disparate impact and discriminatory purpose), the Court should schedule an evidentiary hearing. Courts frequently hold evidentiary

---

[27] *Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000–2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_0.pdf.

[28] *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007 – 2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY%202007%20-%20FY%202019%29_1.pdf.

hearings and trials to hear evidence on the *Arlington Heights* factors. *See, e.g., City of Memphis v. Greene,* 451 U.S. 100, 107 (1981) (noting the circuit court's remand for a trial on the issue of discriminatory purpose); *Arce,* 793 F.3d at 991.

At this evidentiary hearing, Mr. Bernal will present testimony from expert witnesses, including Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, and Dr. Benjamin Gonzalez O'Brien, Associate Professor of Political Science at San Diego State University. *See* Exhibit K, Curriculum Vitae of Prof. Lytle Hernández; Exhibit L, Curriculum Vitae of Prof. Gonzalez O'Brien. Both experts have written extensively on the Undesirable Aliens Act of 1929 and can testify about the historical events surrounding its passage. At the end of this hearing, if the government has not carried its burden to show that the crime of illegal entry would have been enacted without a racially discriminatory motive, § 1325 is unconstitutional, and the Court must dismiss the charge.

## III.   MOTION TO PROHIBIT MR. BERNAL'S UNLAWFUL AND UNCONSTITUTIONAL CIVIL ARREST AT COURT

In March of 2011, ICE's director distributed Policy Number 10072.1 ("2011 Policy"), a document that detailed the agency's civil immigration enforcement priorities regarding non-citizens who were in the United States without authorization. The 2011 Policy said that immigration officers, facing limited resources, should focus on so-called "Priority 1 . . . aliens who pose a danger to national security or a risk to public safety . . . ." *Id*. In a follow-up memo, ICE explained that its policy prohibited it from initiating deportation proceedings against an "immediate victim or witness to a crime" and people "in the midst of a legitimate effort to protect their civil rights or civil liberties." *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 148 (D. Mass. 2019). In 2014 ICE released its policy on civil deportation arrests at courthouses, and instructed agents to only make such arrest against Priority 1 targets and only if it was not practical to make a civil deportation arrest elsewhere. *Id*.

Protocols changed when President Donald Trump issued Exec. Order No. 13,768, 82 Fed. Reg. 8,799, a policy that put greater emphasis on enforcement of immigration laws. The new order moved away from the Obama Administration policy that only prioritized people who pose a national security or public safety risk, and instead expanded the universe of potential arrestees to now include people who were convicted of any criminal offense, people who were merely charged with an offense, people who committed acts that constitute a chargeable criminal offense but were not actually charged, people who "engaged in fraud or willful misrepresentation" before a governmental agency, people abused social services, and people who are subject to a final order of removal. *Id.*

On January 10, 2018, ICE issued Directive Number 110721.1 ("2018 Courthouse Arrest Policy"), the agency's policy for civil immigration enforcement actions inside federal, state and local courthouses. This is the policy that is currently in place. The directive said that civil deportation arrests should occur inside courthouses because parties there are usually screened for weapons before they enter the building and can be presumed to be less dangerous. *Id.* at *1. It permitted civil deportation arrests inside courthouses of:

> [S]pecific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to deport, and aliens who have re-entered the country illegally after being removed, when ICE officers or agents have information that leads them to believe the targeted aliens are present at that specific location.

*Id.* The policy also allows agents to arrest for deportation "family members and friends accompanying the target alien to court appearances or serving as a witness in a proceeding" in some circumstances. *Id.*

With these policy memoranda as a backdrop, immigration officers in the Southern District of California have routinely arrested people charged with illegal entry in violation of 8 U.S.C. § 1325 in the courtroom or adjacent hallway immediately after the criminal case concludes. Immigration officers regularly

MR. BERNAL'S MOTIONS TO DISMISS THE COMPLAINT, PROHIBIT HIS UNLAWFUL ARREST AND STAY PROCEEDINGS

follow defense lawyers to track § 1325 cases in various courtrooms, and they are present at trials sitting in the gallery waiting to effectuate a civil arrest once the trial is concluded. Mr. Bernal expects similar treatment at his upcoming trial and he expects that immigration officers will attempt a civil removal arrest inside or directly outside the courtroom.

It is highly likely that immigration officials plan to effectuate a warrantless removal arrest in this courthouse on the date of Mr. Bernal's trial. It is routine in the Southern District of California for Border Patrol agents to be present at court hearings and to arrest defendants in the courtroom or courthouse in order to place the defendant in civil removal proceedings. As explained below, civil deportation arrests at a courthouse, or against a party headed to or departing from a courthouse for official business, are prohibited and violate Mr. Bernal's constitutional rights and legal privileges. This Court must take action to prevent immigration officers from effectuating a civil deportation arrest of Mr. Bernal while Mr. Bernal is at the courthouse or comes and goes from the courthouse for official business. Immigration officers routinely follow defendants to their court appearances and then sit in the gallery to see what happens in the criminal case. Typically, if the criminal case concludes, either through dismissal or a verdict, the immigration officers then arrest the defendant in court or in the hallway outside the courtroom. This practice violates long-standing common law principles as well as Mr. Bernal's Sixth Amendment and Due Process rights. The Court must order the Government not to civilly arrest Mr. Bernal coming to or going from his court appearance. If this Court fails to grant Mr. Bernal's motion, he will be vulnerable to irreparable harm. As such, he requests that this Court stay the proceedings or final conclusion of the case until this motion is resolved on appeal.

The Court has broad supervisory powers that it should exercise to ensure that Mr. Bernal is not irreparably injured by civil deportation arrest at the courthouse. Courts have broad supervisory powers "to remedy a constitutional or statutory

violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." *United States v. Barrera–Moreno,* 951 F.2d 1089, 1091 (9th Cir. 1991).

Mr. Bernal has no adequate remedy other than this motion seeking an order that that civil deportation arrests of Mr. Bernal or defense witnesses while either are headed to, at, or departing from the courthouse for official business violates common law and constitutional rights.

### A. Civil deportation arrests at courthouses violate a longstanding common law privilege protecting people from civil process coming to, attending, and departing from court for official court business

Deportation arrests at courthouses run afoul of a common law privilege that prohibits civil arrests at courthouses, or when parties, witnesses, and others attached to a case are at, en route to, or departing from a courthouse on official business. *See Stewart v. Ramsay*, 242 U.S. 128, 129 (1916). The Supreme Court in *Stewart* addressed whether a witness and plaintiff may be served with civil process while attending court for official business. "The true rule, well founded in reason and sustained by the greater weight of authority, is, that suitors, as well as witnesses, coming from another State or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going." *Id.* at 129. Four recent decisions from district courts have applied *Stewart* and the common law privilege against civil courthouse arrest to prohibit immigration officials from engaging in exactly the type of arrest Mr. Bernal seeks to prevent in this motion. *See infra* Section III.A.3 (discussing cases).

#### 1. Deportation arrests are civil arrests – they are not criminal.

Immigration arrests can be civil or criminal, and the distinction is important to keep straight. Mr. Bernal was criminally arrested and charged with an immigration violation at the start of this case. By contrast, the arrest by immigration authorities at issue in this motion is an arrest to place Mr. Bernal in deportation proceedings, which is a civil, not criminal, proceeding. *I.N.S. v. Lopez-Mendoza*,

468 U.S. 1032, 1039 (1974) (holding that deportation proceedings are "purely" civil); *Arizona v. United States*, 567 U.S. 387, 407 (2012) (holding that "it is not a crime for a removable alien to remain present" in the United States and that deportation proceedings are civil even if criminal conduct is the reason for the deportation); *Fong Tue Ting v. United States*, 149 U.S. 698, 730 (1893) (holding that "deportation is not a punishment for a crime); *see also* HILLEL R. SMITH, CONG. RESEARCH SERV., LSB10362, IMMIGRATION ARRESTS IN THE INTERIOR OF THE UNITED STATES: A BRIEF PRIMER (2019) (explaining restrictions on deportation arrests).

The case law is clear that deportation proceedings are "purely" civil proceedings, and immigration authorities must adhere to the rules attendant to civil process when enforcing a civil deportation order.

### 2. There is a common law privilege that bars civil arrests at courthouses.

A deportation arrest of Mr. Bernal or a witness on their way to court, while at court, or for a reasonable time in departing from court on official business would violate the common law privilege that bars the civil arrest at the courthouse. This privilege is centuries old and is based on the simple premise that the justice system operates best when parties to a case show up for proceedings, and that parties won't go to court if they could be arrested once there. *See Stewart v. Ramsay*, 242 U.S. 128, 129-30 (1916); NATHAN LEVY., JR., MESNE PROCESS IN PERSONAL ACTIONS AT COMMON LAW AND THE POWER DOCTRINE, 78 YALE L.L. 52, 61-70 (1968) (summarizing the history of civil arrests).[29]

---

[29] This law review article is not available on Westlaw, but an open source version can be found at https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=5938&context=ylj

The right to be free from civil process at court was clearly recognized by the Supreme Court over one hundred years ago in *Stewart.*

> The citizen, in every claim of right which he exhibits, and every defense which he is obliged to make, should be permitted to approach them, not only without subjecting himself to evil, but even free from the fear of molestation or hindrance. He should also be enabled to procure, without difficulty, the attendance of all such persons as are necessary to manifest his rights. Now, this great object in the administration of justice would in a variety of ways be obstructed, if parties and witnesses were liable to be served with process, while actually attending the court.

*Stewart*, 242 U.S. 129-30. The Court reaffirmed this privilege several years later in *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923), and this long standing privilege remains in effect to this day.

> 3.      Because deportation arrests are civil procedures, the common law doctrine barring civil arrests at courthouses necessarily bars deportation arrests at courthouses.

*Stewart*'s common law rule prohibiting civil arrests does not include an exception for civil deportation arrests. When the Immigration and Naturalization Act ("INA") was enacted in 1952, the common law privilege against courthouse arrests was squarely in place as recognized by the Supreme Court in *Stewart* in 1916. Statutes that "invade" the common law must be read as to keep the common law intact unless the statute has a contrary purpose that is evident. *United States v. Texas*, 507 U.S. 529, 535 (1993). The INA does not address courthouse arrests and it cannot be said that Congress clearly intended to overturn the longstanding common law privilege against courthouse arrest when it passed the INA.

The INA must be constrained by the longstanding rule against civil courthouse arrests because the common law privilege against civil courthouse arrests was clearly established long before the INA was passed and the INA did not contain a clear directive from Congress supplanting the common law privilege against civil arrest in court. Because this common law privilege is contained, rather

MR. BERNAL'S MOTIONS TO DISMISS THE COMPLAINT, PROHIBIT HIS UNLAWFUL ARREST AND STAY PROCEEDINGS

than supplanted by the INA, civil deportation arrests that occur when a person is on their way to, at, or departing from official court business are impermissible because they run afoul of the long-standing common law privilege against civil arrest while attending, present at, or departing from official court business.

Every court that has been confronted with this issue has agreed that the common law privilege bars civil deportation arrests in or around the courthouse. Indeed, four recent decisions from three district courts have all unwaveringly ruled that there is a federal and state common law privilege that bars civil deportation arrests in courthouses and also prohibits authorities from arresting participants in a case as they head to or depart from a courthouse on official business. *See Ryan v. U.S. Immigration & Customs Enf't*, 382 F.Supp. 3d 142, 146, 160 (D. Mass. 2019) (ruling that plaintiffs were likely to succeed on the merits of a claim that civil immigration arrests are illegal and granting an injunction on such arrest, and holding that "[c]riminal defendants will be unable to vindicate their rights if they are taken into ICE custody prior to appearing in court or if witnesses in their defense are too fearful to visit a courthouse."); *New York v. U.S. Immigration & Customs Enf't*, 431 F. Supp.3d 377, 391 (S.D.N.Y 2019) (ruling that the common law privilege barring courthouse arrests is intact, prohibits deportation arrests and that ICE's courthouse arrest policy "deter[s] immigrants from appearing in court, thus denying them an opportunity to seek justice in their own cases and impeding civil suits and criminal prosecutions by dissuading them from serving as witnesses."); *Washington v. U.S. Dep't of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837, at *26-27 (W.D. Wash. Apr. 10, 2020) (ruling that plaintiffs proved that the common law privilege barring civil arrests, including deportation arrests, at courthouses "existed at the time the INA was enacted, that Congress did not abrogate the privilege or privileges when it passed the INA, and that, in issuing their 'courthouse arrest' policy, [DHS, ICE and CBP] exceeded the authority delegated to them in the INA."); and *New York v. U.S. Immigration & Customs*

*Enf't*, No. 19-cv-8876(JSR), 2020 WL 3067715, at *7 (S.D.N.Y. June 10, 2020) (ruling that "courthouse civil arrests are not lawful, because they contravene the common-law privilege, which the INA is best read to incorporate, that protects courts and litigants against these intimidating and disruptive intrusions."). No courts have made rulings on this issue contrary to these four decisions.

While ICE has an internal policy to arrest people at courthouses, this policy runs afoul of Mr. Bernal's rights to be free from such arrests. The reasons for the privilege – courts run better when all the relevant players show up – remain relevant today, and it is critically important to provide litigants access to the court to resolve their cases without being intimidated that their participation in the judicial system will compound their problems. This Court should grant this motion and rule consistent with the District of Massachusetts, the Western District of Washington, and the Southern District of New York to declare that a civil deportation arrest of Mr. Bernal while he is en route to, at, or departing from the courthouse for court business would violate Mr. Bernal's common law privilege against civil arrest.

**B.    The likelihood of Mr. Bernal being subject to a civil deportation arrest while attending court for his criminal matter infringes on his Sixth Amendment and Due Process rights to present a defense.**

The Sixth Amendment is the bedrock of the criminal justice system and guarantees a defendant the right to a speedy and public trial. The threat of civil immigration arrest while Mr. Bernal is on his way to, present at, or departing from court on official court business chills the exercise of his right to present a defense and to call witnesses in his defense. ICE's policy of arresting defendants at courthouses in order to begin civil deportation proceedings deters Mr. Bernal from exercising his Sixth Amendment right to access the court to adjudicate his case.

Defendants have a Sixth Amendment fundamental right to access the court. Government policies, rules, and directives that deter defendants from attending court to adjudicate their case, and to defend their liberty interests interfere with this right and are illegal. *Bounds v. Smith*, 97 S. Ct. 1491, 1494 (1977); *United States v.*

*Jackson*, 390 U.S. 570, 583 (1968); *Casey v. Lewis*, 43 F.3d 1261, 1266 (9th Cir. 1994); and *Natale v. United States*, 424 F.2d 725, 728 (9th Cir. 1970). *See also Nordstrom v. Ryan,* 762 F.3d 903, 906 (9th Cir. 2014) (holding that a jailhouse policy that deterred a defendant form communicating candidly with his attorney violated Sixth Amendment rights). ICE's civil courthouse arrests have such a chilling effect. *New York v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 382 (S.D.N.Y. 2019).

Each time Mr. Bernal appears at court for a preliminary hearings, conference, trial, or other proceeding, an ICE officer may stalk him down corridors, watch him from the back of the courtroom, and arrest him for a civil deportation proceeding at their whimsy. The omnipresent risk of civil arrest entering, being present at, and leaving court infringes on Mr. Bernal's right to be present at court to vindicate his right to present a defense. It forces him to exercise his right to present a defense by forfeiting his right to be free from civil arrest at court.

## IV.   MOTION TO STAY PROCEEDINGS

If the Court denies Mr. Bernal's motions to prevent his civil removal arrest in court, the Court should stay Mr. Bernal's trial pending an interlocutory appeal and/or writ of mandamus to the district Court. Mr. Bernal intends to seek review before the district court if this Court denies his motion to prohibit civil deportation arrest in the courthouse and this Court should stay the criminal proceedings for resolution of this issue if it does not grant the motion to prohibit the civil arrest.

The issuance of a stay pending appeal is appropriate when the party requesting the stay demonstrates: (1) "serious questions going to the merits were raised," (2) "the balance of hardships tips sharply [in favor of the party seeking the stay]," (3) "there is a likelihood of irreparable injury" in the absence of a stay, and, (4) the stay is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (applying the *Wild Rockies* "serious questions" test to the

petitioner's request for a stay pending appeal). All of these factors weigh in favor of a stay because the Mr. Bernal will suffer irreparable injury if forced to be present in court and subject to civil immigration arrest.

### A.   There are serious questions going to the merits of this case.

To receive a stay, Mr. Bernal is *not* required to show "that it is more likely than not that [he] will win on the merits." *Leiva-Perez*, 640 F.3d at 967. Instead, Mr. Bernal need only show that there are "serious questions going to the merits." *Id.* (quoting *Wild Rockies*, 632 F.3d at 1135). The Ninth Circuit has explained that this minimal standard makes sense in the context of a request for a stay because"[a] more stringent requirement would either . . . put every case in which a stay is requested on an expedited schedule, with the parties required to brief the merits of the case in depth for stay purposes, or would have the court attempting to predict with accuracy the resolution of often-thorny legal issues without adequate briefing and argument." *Leiva-Perez*, 640 F.3d at 967. "Such pre-adjudication adjudication would defeat the purpose of a stay, which is to give the reviewing court the time to 'act responsibly,' rather than doling out 'justice on the fly.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)).

Here, Mr. Bernal has demonstrated that there are serious questions going to whether he can lawfully be ordered to come to court while being subjected to civil immigration arrest on his way to court, while at court, or leaving from court. Moreover, the four recent district court decisions addressing this issue all agree with Mr. Bernal's position. *See supra* Section III.A.3 (discussing cases).

### B.   The balance of hardships tips sharply in favor of Mr. Bernal.

The balance of hardships tips sharply in Mr. Bernal's favor. Issuing a stay will not result in any hardship to the government. By contrast, Mr. Bernal is currently out of custody on bond and in compliance with his bond conditions. Forcing the Mr. Bernal to move forward with trial would likely subject him to unlawful civil immigration arrest at court regardless of the result of trial.

**C.     There is a likelihood of irreparable injury in the absence of a stay.**

If the proceedings in magistrate court continue while the legality of civil courthouse arrest remains in dispute, then Mr. Bernal will be irreparably harmed in that he will forced to prepare with trial believing that his civil immigration arrest is likely to take place at the courthouse. As argued at length above, civil immigration arrests at the courthouse infringe on Mr. Bernal's Sixth Amendment and Due Process rights. Generally, the violation of a constitutional right suffices to demonstrate "irreparable harm." *See Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1225 (9th Cir. 2003).

**D.     The stay is in the public interest.**

There is a compelling and valid public interest that civil immigration arrests be thoroughly reviewed by the courts before Mr. Bernal's case proceeds to trial because it may impact which members of the public wish to be present for court. Stripping the proceedings of the threat of civil arrest will encourage public access to the courts and it is therefore in the public's best interest for the legality of civil deportation arrests at the courthouse to be resolved before trial in this case.

## V.     CONCLUSION

Mr. Bernal respectfully requests this Court grant his motions.

Respectfully submitted,


Dated:  July 31, 2020                    *s/ Chandra L. Peterson*
                                        Federal Defenders of San Diego, Inc.
                                        Attorneys for Mr. Bernal-Sanchez
                                        Email:  Chandra_Peterson@fd.org

MR. BERNAL'S MOTIONS TO DISMISS THE COMPLAINT, PROHIBIT HIS UNLAWFUL ARREST AND STAY PROCEEDINGS