KARA HARTZLER
California State Bar No. 293751
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Kara_Hartzler@fd.org

Attorneys for Defendant-Appellant

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## HON. ANTHONY J. BATTAGLIA

| United States of America, | Case No.:   20-MJ-20169-JLB-AJB |
|---|---|
| Plaintiff-Appellee, | |
| v. | **Appellant's Reply Brief** |
| Jhoantan Vilmar Bernal-Sanchez, | |
| Defendant-Appellant. | |

1

**INTRODUCTION**

2      In this appeal of a conviction for misdemeanor attempted illegal entry

3 under 8 U.S.C. § 1325 Mr. Bernal raised four issues unique to this case and

4 sought to preserve several other challenges that this Court has elsewhere denied.

5 As to the four issues, the government disagrees with Mr. Bernal that it 1) used the

6 wrong type of subpoena to obtain his employment records and 2) improperly used

7 these records to threaten to impeach Mr. Bernal and bring new charges against

8 him. The government also disagrees that the magistrate judge 3) erred in her

9 discovery and disclosure rulings relating to the potential bias of government

10 witnesses and 4) improperly refused to consider relevant BIA decisions. Because

11 the government's arguments are not persuasive, this Court should vacate

12 Mr. Bernal's conviction.

13

**ARGUMENT**

14 **I.**    **The government used the wrong type of subpoena, setting a dangerous precedent for this district.**

15

16      In his opening brief, Mr. Bernal first argued that the government obtained

17 six years of his employment records by doing an end run around this Court's

18 subpoena rules. Rather than seek court approval to obtain documents in advance

19 of trial under Fed. R. Crim. P. 17(c), the government issued a non-court-approved

20 subpoena under 17(a) but instructed Mr. Bernal's employer, 20/20 Plumbing, that

21 it "may" submit the records directly to the prosecutor before trial, which it did by

22 immediately turning the records over to agents serving the subpoena. Dkt. 80,

23 Exhibit A, Subpoena Aug. 25, 2020. The government sees no problem with this,

24 claiming that the fact that 20/20 Plumbing "voluntarily provided some

25 information ahead of time" did not "render the subpoena invalid or convert it into

26 one needing pre-approval from the court." Government Brief (GB) 1.

27      The problem with the government's position is that it would render Local

Rule 17.1(b) meaningless. Black's Law Dictionary defines various types of

subpoenas, one of which is a "subpoena duces tecum" that orders a witness to "appear in court and to bring specified documents, records, or things." Black's Law Dictionary (11th ed. 2019). Here, the government's subpoena ordered a representative of 20/20 Plumbing to appear in court on the day of Mr. Bernal's trial and to "bring with you the following document(s) or object(s)," including "all employment records, including but not limited to," time cards, payroll records, pay stubs, leave records, cell phone records, and a daily work assignment list "from January 2014 to the present." Dkt. 80, Exhibit A, Subpoena August 25, 2020. Because it ordered 20/20 Plumbing to both "appear in court and to bring specified documents, records, or things," as Black's Law Dictionary describes, this was a textbook example of a "subpoena duces tecum."

But Local Rule 17.1(b) sets forth at least three requirements for a subpoena duces tecum: 1) it must be "served on all parties" at least 72 hours before the return date; 2) it must be "supported by an affidavit or declaration" establishing that the documents are relevant, necessary, and not otherwise available, and that the request was made in good faith and not for discovery purposes; and 3) the items must be "produced before a magistrate judge" who will then "make them available for the inspection of the parties and the attorneys." The government does not claim (nor can it) that its subpoena complied with any of these requirements. So even though the government's document functioned in all respects as a subpoena duces tecum, it maintains that the option it gave 20/20 Plumbing to "voluntarily provide[] some information ahead of time" excused it from complying with these requirements under Local Rule 17.1(b). GB 1.

If the government were correct, Local Rule would serve little purpose. All a party would have to do to get around these requirements is what the government did here: include an "attachment" giving the subpoena recipient the option to submit the documents in advance, thereby cloaking a 17(c) subpoena duces tecum

in the guise of a 17(a) subpoena. Courts would have no oversight of when a subpoena is issued, the scope of material it requested, and whether other parties received notice or had an opportunity to quash it. Because the majority of subpoena recipients (especially third parties with no stake in the case) would likely comply as soon as possible to avoid their own legal consequences, lawyers could obtain the bulk of their evidence without ever meeting the requirements of Local Rule 17.1(b). In short, litigants would have no incentive to subject themselves and the evidence they seek to judicial oversight.

Nevertheless, the government relies heavily on the Sixth Circuit decision in *United States v. Llanez-Garcia*, 735 F.3d 483 (6th Cir. 2013), claiming that it "found a wide variety of practices amongst district courts, with some requiring pre-approval and others not." GB 12. But the government never points to any district mentioned in *Llanez-Garcia* (or otherwise) that has a similar version of Local Rule 17.1(b) and yet allows parties to include an early production "option" to bypass it. In fact, after the events in *Llanez-Garcia* transpired, the district court there "issued a standing order that requires the court's authorization before a subpoena can issue for pretrial production of evidence." 735 F.3d at 489 n.1. And while the government asserts that skirting Local Rule 17.1(b) is a "regular practice in this district," GB 12, it never points to a single example of this or explains why, as the same district court noted, "[t]he mere fact that multiple individuals may be engaging in conduct that abuses the Court's subpoena power" could "serve as a defense" to an improper subpoena. 735 F.3d at 490.

The government is also tone deaf to the intimidating and coercive effects of a subpoena on the average person. A subpoena is "an official command" with "some coercive tendency." *Cudahy Packing Co. of Louisiana v. Holland*, 315 U.S. 357, 363 (1942). This coercive effect may be due to "ignorance of their rights on the part of those whom it purports to command," the "natural respect

for what appears to be an official command," or a "reluctance to test the subpoena's validity by litigation." *Id*. at 363–64. *See also Kubat v. Thieret*, 867 F.2d 351, 361 (7th Cir. 1989) (noting that attorneys often choose not to subpoena witnesses to "avoid the possible intimidating effect"); *Abordo v. Mobi PCS*, 2016 WL 777921, at *7 (D. Haw. Feb. 25, 2016), *aff'd,* 684 F. App'x 631 (9th Cir. 2017) (stating that "a subpoena may exert a coercive influence" on its recipient).

So while the government repeatedly insists that 20/20 Plumbing "voluntarily" turned over Mr. Bernal's employment records early of its "own volition," GB 1, 8, 10, the more likely conclusion is that 20/20 Plumbing quickly succumbed to the pressure inherent in being served a federal subpoena. And while the government claims that it merely provided 20/20 Plumbing an "additional method" to provide the documents that, "notably, [it] did not use," the only reason 20/20 Plumbing did *not* use this "method" is because it immediately turned the records over to the agents who served the subpoena. GB 10; Dkt. 80, Exh. A. This proves Mr. Bernal's exact point—that this *functioned* as a 17(c) subpoena duces tecum and thus must comply with the requirements of Local Rule 17.1(b).

The government's argument includes other misdirections and omissions. For instance, the government claims that its circumvention of Local Rule 17.1(b) "ended up benefiting the defense" because it was able to receive the documents before trial. GB 10. But this benefited the government as much or more than Mr. Bernal, since the government heavily relied on these records in its case-in-chief. And in any event, Mr. Bernal's objection has never been *when* he received the records but rather *whether* the government had a right to request six years of highly sensitive employment records when (at most) only records from several weeks in January 2020 were relevant. Yet the government never explains why it asked for six years of records, nor does it deny that this allowed it to obtain records purportedly showing that Mr. Bernal previously worked "under a false

1   social security number," thus subjecting him to an entirely different basis of

2   criminal liability. *See* Dkt. 96 at 7.

3          Had the government followed the Local Rule's requirement of service on

4   "all parties," Mr. Bernal could have quashed the subpoena or at least sought to

5   limit it to records that were "relevant" to the prosecution under Local Rule

6   17.1(b). This shows precisely why judicial oversight of advance-production

7   subpoenas is necessary—to keep parties from going on intrusive, unilateral

8   fishing expeditions without the accountability and safeguards that Local Rule

9   17.1(b) was designed to ensure.

10         Finally, the government dismisses the impact its approach would have on

11  this district, claiming that "Bernal's fears of 'dangerous consequences' are

12  overblown." GB 12. But apart from this generic refutation, the government never

13  explains *why* these consequences would not come to fruition. If the Court finds

14  that what the government did was proper, it would open the door for every party

15  in the Southern District to do what the government did here—obtain evidence in

16  advance of trial under the guise of the court's authority with no notice to the

17  opposing party and no court oversight as to the scope of the information sought.

18  Because this effectively eviscerates Local Rule 17.1(b), it would be a sweeping

19  rule change with drastic consequences for every litigant and judge in this district.

20         In his Opening Brief, Mr. Bernal also explained that this error was not

21  harmless because: 1) the employer's testimony contradicted his field statements

22  and theory of defense; 2) the government used the employer to introduce five

23  exhibits that did the same; and 3) the magistrate judge relied heavily on this

24  damaging evidence. AOB 12–13.  The government claims that because a

25  representative from 20/20 Plumbing "attended trial and brought company records

26  with her, in full compliance with Rule 17," those records still would have come

27  in. GB 12. But the error here was that the government failed to comply with the

requirements of Local Rule 17.1(b); because it did not, evidence stemming from the subpoena—in its entirety—must be excluded. And because the government has not proven that the remaining evidence was sufficient to convict, it fails to show that this error was harmless.

## II.   The Court should dismiss the complaint for a due process violation.

In his opening brief, Mr. Bernal also argued that the prosecutor's actions violated due process by chilling his right to testify. After Mr. Bernal's wife was diagnosed with COVID and the doctor ordered the family to quarantine, he requested a continuance of the trial because he would not be able to enter the courthouse. *See* SER 359. But armed with the employment records obtained through its unlawful subpoena, the prosecutor claimed that Mr. Bernal was still working at his plumbing job and thus not complying with the doctor's order to quarantine. SER 381. The government then sought to use this information to impeach Mr. Bernal at trial and investigate new charges against him. *See id.*

Below, the government largely claimed that it was the "Defendant" who had misled the magistrate judge through the statements in his declaration. *See* Dkt. 94. On appeal, however, the government accuses *defense counsel* of underhanded behavior, questioning "why counsel felt the need to mislead the judge." GB 17. *See also* GB 15 (referring to counsel's "misleadingly drafted declaration"); GB 18 (alleging that "counsel (presumably) drafted a misleading declaration"). To begin, the government presents zero evidence that defense counsel was aware that Mr. Bernal had been working when she drafted the motion. But if she were aware, this would undermine the government's entire argument, since it means that Mr. Bernal truthfully advised defense counsel he was working and merely signed the "misleading" declaration that *she* instructed him to sign. In other words, if defense counsel is the one who purportedly sought to mislead the court, as the government claims, there was no basis to impeach

Mr. Bernal or investigate new charges against him—indeed, as the government itself admits, any attempt on his part to deceive the judge was "unclear." GB 18.

Furthermore, the government has still never shown that Mr. Bernal was *not* quarantining, since there is no evidence that his plumbing jobs required him to come in contact with others (and indeed, millions of Americans have continued to work from alternate locations). And since the magistrate judge found that his declaration was "technically true," Transcript, Bench Trial, Oct. 15, 2020, at 19, the government still fails to explain what charges it could have brought against him, or what possible motivation it could have had to inform Mr. Bernal of this looming prosecution apart from a desire to intimidate him and chill his testimony at trial. Finally, the government does not deny that the statements in Mr. Bernal's declaration were ultimately irrelevant, since it "very well may be" that he would "not have been allowed into the courthouse regardless." GB 17.

Given that the government claims it is *defense counsel* who was responsible for "misleading" the magistrate judge, and admits that it is "unclear" whether Mr. Bernal engaged in any deceptive behavior, GB 18, its threats of impeachment and future charges were even more inappropriate. Accordingly, to protect Mr. Bernal's due process rights, the Court should exercise its "inherent supervisory powers" to dismiss the complaint. *United States v. Gonzalez*, 800 F.2d 895, 899 (9th Cir. 1986).

**III.   The magistrate judge erred in her discovery and disclosure rulings relating to the potential bias of government witnesses.**

After the prosecutor disclosed that at least one of the agents who later testified at trial was a member of the "I'm 10-15" Border Patrol Facebook group, defense counsel renewed her request for supplemental discovery. Dkt. 64 at 7–8. Citing reports that an archived copy of the Facebook page was in the federal government's possession, defense counsel argued that she was entitled to a copy of this agent's activity on the site so she could present potential evidence of bias

during trial. Transcript of Motion Hearing, Aug. 24, 2020, at 8, 10. The magistrate judge denied this request for supplemental discovery and also denied Mr. Bernal's requests to provide particularized findings in support of her three decisions that the government need not disclose certain items of evidence to the defense and that its applications could remain sealed. *Id.* at 12–15; Dkt. 61, 65, 68, 72, 74, 100.

The government claims that no additional discovery was warranted because a check of the agent's personnel file under *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), "came back clean." GB 20 (quotations omitted). But the government never addresses Mr. Bernal's evidence from multiple government sources showing that the FBI has not yet completed its review of over 10,000 agents who were members of that group. *See* Dkt. 64, Exhibit B, C, D. In other words, there is good reason to believe that any evidence of misconduct by this agent has not yet made it into his file. This is more than the mere "speculation" the government claims it to be. GB 20. Furthermore, the government's argument that the agent himself "denied involvement in any problematic posts" says nothing, as it is unlikely that any agent would admit to having participated in a racist exchange. GB 20. Thus, the magistrate judge should have granted Mr. Bernal's narrow, reasonable discovery request for a copy of the agent's activity on the "I'm 10-15" Facebook page as potential evidence of bias at trial.

Below, the magistrate judge also denied Mr. Bernals's request to disclose the government's three ex parte applications for an order directing disclosure or non-disclosure of certain evidence and declined his request to at least make particularized findings as to why they should remain sealed in the alternative. In his opening brief, Mr. Bernal thus asked this Court to "independently review the government's applications and, at a minimum, provide its own particularized findings for keeping them under seal." AOB 21. In response, the government states that it has submitted under seal the ex parte application and the magistrate

judge's ruling for the Court's review. GB 19–20. But the government then claims that there is "no requirement—and Bernal cites none—that the Magistrate Judge must provide particularized reasons for ordering non-disclosure of information in this context." GB 19.

But the government's own case law holds to the contrary. The government quotes *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179–80 (9th Cir. 2006), for the vague proposition that when a court seals documents, "'it already has determined that good cause exists to protect this information.'" GB 19. But *Kamakana* then goes on to say (twice) that "if the court decides to seal certain judicial records, it must base its decision on a compelling reason and *articulate the factual basis for its ruling*, without relying on hypothesis or conjecture." 447 F.3d at 1179 (quotations omitted) (emphasis added). *See also id.* at 1182 ("When *sealing* documents attached to a dispositive pleading, a district court must base its decision on a compelling reason and *articulate the factual basis for its ruling*, without relying on hypothesis or conjecture.") (quotations omitted) (second emphasis added). The Court also added that "[i]n the absence of *specifically articulated reasons*, meaningful appellate review is impossible," citing other decisions holding the same. *Id.* & n.8 (quotations omitted) (emphasis added).[1] Because the government's argument contradicts its own authority, the Court at a minimum should make particularized findings as to its decision to seal the government's request and order nondisclosure.

---

[1] "*See also Kasza v. Browner,* 133 F.3d 1159, 1175 (9th Cir. 1998) (remanding and requiring the court provide a statement of reasons 'should it determine in its discretion to leave the seal in place'); [*E.E.O.C. v. Erection Co.*, 900 F.2d 168, 170 (9th Cir. 1990)] (remanding case in which the district court sealed a consent decree because 'the record gives no hint of whether the court considered any or all ... factors and arguments')."

## IV.  The magistrate judge erred in failing to consider or take judicial notice of relevant BIA decisions.

To show that individuals are sometimes "waved through" at a port of entry, Mr. Bernal also submitted copies of decisions from the Board of Immigration Appeals in *Matter of Quilantan*, 25 I&N Dec. 285 (BIA 2010), and *Matter of Areguillin*, 17 I&N Dec. 308 (BIA 1980), and asked the judge to take judicial notice of them. The government claims that the magistrate judge's refusal to do so was proper, citing the distinction between "adjudicative" and "legislative" facts in Federal Rule of Evidence 201. GB 23. But the Ninth Circuit itself has granted "motion[s] for judicial notice of unpublished BIA decisions." *Vazquez v. Gonzales*, 230 F. App'x 717, 718 (9th Cir. 2007). This is because a court may take "judicial notice of another court's opinion ... not for the truth of the facts recited therein, but for the existence of the opinion." *Lee v. City of Los Angeles,* 250 F.3d 668, 690 (9th Cir. 2001). Here, then, the magistrate judge should have taken judicial notice of the "existence" of these *published* BIA decisions and given them the weight they deserved in the context of Mr. Bernal's case.

## V.  The government raises no new arguments on the issues Mr. Bernal seeks to preserve.

Mr. Bernal also preserved several challenges that this Court has previously denied, including that: 1) the complaint failed to allege all the elements of the offense; 2) Mr. Bernal's prosecution violated equal protection; and 3) section 1325 violates the nondelegation doctrine and is void for vagueness. As the government simply incorporates its briefing from other cases, GB 24–25, Mr. Bernal does not repeat those arguments here.

### CONCLUSION

For these reasons, this Court should vacate Mr. Bernal's conviction.

1

2                                              Respectfully submitted,

3

4   Dated:  May 24, 2021                       *s/ Kara Hartzler*
                                               _____
5                                              Kara Hartzler
                                               Federal Defenders of San Diego, Inc.
6                                              Attorneys for Mr. Bernal-Sanchez
                                               Email:  kara_hartzler@fd.org
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27